IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEANETTE CHANCELLOR,           :     CIVIL ACTION
                               :     NO. 06-1067
          Plaintiff,           :
                               :
     v.                        :
                               :
POTTSGROVE SCHOOL DISTRICT,    :
et al.,                        :
                               :
          Defendants.          :


M E M O R A N D U M
_____

EDUARDO C. ROBRENO, J.                    AUGUST 8, 2007


     Plaintiff Jeanette Chancellor, a former student at

Pottsgrove High School, had an approximately ten-month-long

sexual relationship with her band teacher, Defendant Christian

Oakes, during the 2003-04 school year, her senior year of high

school.  On March 10, 2006, Plaintiff instituted the present suit

against Oakes, as well as against Pottsgrove School District and

Joyce Wishart, the principal of the high school.[1]

     Pottsgrove failed to include the statute of limitations as

_____

     [1] For convenience, the school district and Wishart will be
referred to collectively as "Pottsgrove," except where necessary
to distinguish between these two defendants.  Oakes will be
treated separately.

     The complaint also named as a defendant Joseph Bender, the
assistant superintendent of the school district, but he has since
been dismissed from the case (doc. no. 26).

an affirmative defense in its answer, but has since moved to
amend its pleading.  For the reasons that follow, the Court will
deny Pottsgrove's motion to amend its answer.

After granting in part and denying in part both Oakes's and
Pottsgrove's motions to dismiss (doc. nos. 12, 20), the following
five claims remain: (1) Title IX against Pottsgrove, (2) § 1983
(Fourteenth Amendment) against Wishart, in her individual
capacity, (3) intentional infliction of emotional distress
against Wishart, (4) § 1983 (Fourth and Fourteenth Amendments)
against Oakes, and (5) intentional infliction of emotional
distress against Oakes.

Both Oakes and Pottsgrove have moved for summary judgment.
For the reasons that follow, both parties' motions will be
denied.


I.  BACKGROUND

Oakes and Plaintiff began their sexual relationship in the
summer of 2003, at the end of Plaintiff's junior year of high
school, shortly after Oakes selected Plaintiff for the position
of drum major, a leadership position in the school band.  Oakes,
born January 25, 1974, was twenty-nine years old at the time.
Plaintiff, born February 14, 1986, was seventeen years old at the
time.  From an early age, Plaintiff struggled with depression,
anorexia, and bulimia.

Oakes and Plaintiff had sex approximately thirty-eight times during the summer and fall of 2003, ceased their relationship from December 2003 to late January 2004, and had sex another approximately eight times between late January 2004 and April 2004.[2]  The sexual encounters took place during band camp in the summer of 2003, in the closet in the band room at the school and in Oakes's car during the 2003-04 school year, and in a hotel during the band's school trip to Virginia Beach in April 2004.

In April 2004, Oakes was apparently also engaged in a sexual relationship with another female student, identified to protect her privacy as A.P.  In late April 2004, A.P.'s mother reported the suspected relationship to the Lower Pottsgrove Township Police Department.  The police, after conducting an investigation that included interviewing Plaintiff, arrested Oakes.  Ultimately, Oakes pled guilty in the Montgomery County Court of Common Pleas to two counts of corruption of a minor (one count for Plaintiff, one count for A.P.), in violation of 18 Pa. Cons. Stat. § 6301.[3]  Following Oakes's arrest, Plaintiff attempted

---

[2] The precise dates of the sexual encounters is relevant because the statute of limitations is at issue here.  While the majority of the sexual encounters took place prior to March 10, 2004, the operative date for statute of limitations purposes, approximately three sexual encounters took place after March 10, 2004, placing them squarely within the actionable period.

[3] The statute reads in relevant part:

Whoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any

suicide and was repeatedly hospitalized for psychiatric reasons, including major depressive disorder.

The crux of Plaintiff's case against Pottsgrove centers on whether Wishart, the school principal, was aware of the sexual relationship between Plaintiff and Oakes, and whether, after becoming aware, Wishart was deliberately indifferent to the relationship. Plaintiff contends that Wishart was aware; Wishart contends that she was not. Plaintiff bases her contention on two incidents.

First, in summer 2003, a school board member told the school board superintendent, Dr. Sharon Richardson, that he had seen Oakes leaving a restaurant with a female student. Dr. Richardson expressed her concerns to Wishart. Wishart, in turn, spoke with Oakes about the incident. The student in question was Plaintiff. Oakes told Wishart that he had taken both drum majors (Plaintiff and a male student) out for lunch following their uniform fittings. Wishart claims that Oakes's response satisfied her and that she reported Oakes's statement back to Dr. Richardson. Dr. Richardson claims that Wishart never reported back to her regarding the conversation with Oakes.

_____

> minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of any crime, or who knowingly assists or encourages such minor in violating his or her parole or any order of court, commits a misdemeanor of the first degree.

18 Pa. Cons. Stat. § 6301(a)(1).

Second, in August 2003, Plaintiff told her friend A.P. (the other female student with whom Oakes later had a sexual relationship) that Plaintiff and Oakes were involved in a sexual relationship.  A.P. told her mother about Plaintiff's statement, and A.P.'s mother confronted Oakes about the allegation.  Oakes, in turn, arranged a meeting with Wishart.  According to Wishart, "[Oakes] called me on the phone and he said that he would like to meet with me, because apparently one of the students had gone home and said something to her mother about something occurring between [Oakes] and another student. . . . I assumed that it was romantic or something of that nature."  Wishart Depo. at 54, 57. According to Wishart, at her meeting with Oakes, she asked him what it meant that Plaintiff had told A.P. that "something was going on" between Oakes and Plaintiff.  Id. at 64.  Oakes replied that it was "something sexual.  And at that point he blushed about it and appeared to be embarrassed."  Id.  When asked "Did you question him about it?," Wishart responded: "I did not.  I did not, because he brought it to me, and he said he would like to have it cleared up, and so I told him that I would make arrangements to meet with the girls and to get to the bottom of it."  Id.  Wishart claims she investigated the matter by speaking with A.P., Plaintiff, A.P.'s mother, and Plaintiff's parents. Id. at 73-92.  According to Plaintiff and Plaintiff's parents, Wishart never contacted or spoke with any of them regarding the

allegation.  Plaintiff Depo. at 112, 121; Douglas Chancellor Depo. at 22; Mary Jane Chancellor Depo. at 30.

Wishart also claims that she called Dr. Richardson, the superintendent, to report the allegation.  Wishart Depo. at 68-69.  Dr. Richardson has no recollection of this phone call, Richardson Depo. at 45-51, or indeed of "anyone telling her about any rumor and/or information that Oakes was having an inappropriate and/or intimate and/or sexual relationship with a School District student prior to April 27, 2004," the day the police alerted the assistant superintendent of A.P.'s allegation. Pottsgrove's Resp. to Pl.'s First Set of Interr., at 3.


II.  DISCUSSION

A.  <u>Pottsgrove's Motion to Amend Its Answer</u>

Both Oakes and Pottsgrove moved to amend their answers to add statute of limitations as an affirmative defense.  Plaintiff did not oppose Oakes's motion, and the Court granted it (doc. no. 39).  Plaintiff does, however, oppose Pottsgrove's motion.

After the Court granted in part and denied in part Pottsgrove's motion to dismiss, Pottsgrove filed its answer and affirmative defenses (doc. no. 13).  Although Pottsgrove listed thirty-four affirmative defenses, the statute of limitations was not one of them.

Pottsgrove argues that its motion to amend should be

evaluated under Federal Rule of Civil Procedure 15(a), which provides that "leave shall be freely given [for a party to amend its pleading] when justice so requires."  "In the absence of substantial or undue prejudice, denial [of a motion to amend] must be grounded in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment."  Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of V.I., Inc., 663 F.2d 419, 425 (3d Cir. 1981) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  Thus, under Rule 15(a), the burden is on the party opposing the amendment to show prejudice, bad faith, undue delay, or futility.

Plaintiff, however, argues that, because the deadline for filing motions to amend specified in the Court's pretrial scheduling order had passed,[4] Pottsgrove's motion to amend must be evaluated under the stricter standard specified in Federal Rule of Civil Procedure 16(b).  Under Rule 16(b), once a scheduling order has been entered, "good cause" must be shown by the party seeking to modify the order.  According to the advisory committee notes to the 1983 amendments to the Federal Rules, Rule 16(b) was intended to "assure[] that at some point both the

---

[4] The scheduling order in this case specified that motions to amend the pleadings shall be filed by July 3, 2006 (doc. no. 21).  Here, the motion to amend was filed on December 1, 2006, approximately five months late.

parties and the pleadings will be fixed, by setting a time within
which joinder of parties shall be completed and the pleadings
amended." Thus, under Rule 16(b), the burden is on the party
seeking the amendment to show "good cause."

Although the Third Circuit has not explicitly addressed this
tension between Rule 15(a) and Rule 16(b), seven circuit courts
have. See Riofrio Anda v. Ralston Purina, Co., 959 F.2d 1149,
1154-55 (1st 1992); Parker v. Columbia Pictures Indus., 204 F.3d
326, 340 (2d Cir. 2000); S&W Enters., L.L.C. v. SouthTrust Bank
of Ala., NA, 315 F.3d 533, 536 (5th Cir. 2003); Leary v.
Daeschner, 349 F.3d 888, 909 (6th Cir. 2003); In re Milk Prods.
Antitrust Litig., 195 F.3d 430, 437 (8th Cir. 1999); Johnson v.
Mammoth Recreations, Inc., 975 F.2d 604, 610 (9th Cir. 1992);
Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998)
(per curium). Each of these courts has come to the same
conclusion: once the pretrial scheduling order's deadline for
filing motions to amend the pleadings has passed, a party must,
under Rule 16(b), demonstrate "good cause" for its failure to
comply with the scheduling order before the trial court can
consider, under Rule 15(a), the party's motion to amend its
pleading. The Court concludes that the Third Circuit would
likely come to the same conclusion. See E. Minerals & Chems. Co.
v. Mahan, 225 F.3d 330, 340 (3d Cir. 2000); see also Dimensional
Comm'ns, Inc. v. OZ Optics, Ltd., 148 Fed. App'x 82, 85 (3d Cir.

2005) (unpublished).

The question before the Court is thus whether Pottsgrove has shown "good cause" for its failure to comply with the Court's pretrial scheduling order. "Good cause" under Rule 16(b) focuses on the diligence of the party seeking the modification of the scheduling order.[5] See Fed. R. Civ. P. 16, advisory cmte. note (1983) ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."); Inge v. Rock Fin. Corp., 281 F.3d 613, 625 (6th Cir. 2002) (holding that Rule 16(b)'s "good cause" standard focuses on a party's diligence); Johnson, 975 F.2d at 609 ("Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment."); 6A Charles A. Wright et al., Federal Practice & Procedure § 1522.1, at 231 (2d ed. 1990) (noting that Rule 16(b)'s "good cause" standard "require[s] the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension"). Thus, if the party was not diligent, there is no "good cause" for modifying the scheduling order and allowing the party to file a motion to amend its pleading. See

---

[5] Under the Rule 15 analysis, the focus is on the prejudice to the party opposing the amendment. See Cornell & Co., Inc. v. Occupational Safety & Health Review Comm'n, 573 F.2d 820, 823 (3d Cir. 1978) (noting the "well-settled" rule that, under Rule 15(a), "prejudice to the non-moving party is the touchstone for the denial of an amendment").

Johnson, 975 F.2d at 609 ("If [a] party was not diligent, the inquiry should end."). Carelessness, or attorney error, which might constitute "excusable neglect" under Rule 6(b), is insufficient to constitute "good cause" under Rule 16(b). See Johnson, 975 F.2d at 609 ("[C]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief [under Rule 16(b)]."); see also S&W Enterprises, 315 F.3d at 536 ("[The plaintiff's] explanation for its delay[]. . .-- inadvertence--is tantamount to no explanation at all."); cf. Wright et al. § 1488, at 682 (noting that counsel's failure to include the amendment in the original pleading due to counsel's oversight should not prevent an amendment under Rule 15(a)).

Under these principles, a party is presumptively not diligent if, at the commencement of the lawsuit, the party knows or is in possession of the information that is the basis for that party's later motion to amend. See S&W Enterprises, 315 F.3d at 536 ("[T]he same facts were known to [the plaintiff] from the time of its original complaint to the time it moved for leave to amend."); Parker, 204 F.3d at 341 (affirming the district court's denial of plaintiff's motion to amend for lack of "good cause" because the plaintiff possessed all the information he needed to support a breach of contract claim before he filed suit, "and nothing he learned in discovery or otherwise altered that fact"); Sosa, 133 F.3d at 1419 ("[T]he information supporting the

10

proposed amendment to the complaint was available to [the plaintiff] even before she filed suit."). Absent diligence, there is no "good cause."[6]

This principle, however, may be rebutted by a clear and cognizable explanation why the proposed amendment was not included in the original pleading. Pottsgrove offers two reasons for its waiting five months after the deadline to file its motion to amend its answer. The first reason is simple error on the part of the attorney. Pottsgrove's counsel represented to the Court that "I usually do plead [as an affirmative defense], you know, everything in the book. I can't tell you why in this case, we didn't put Statute of Limitations in." 1/25/07 Trans. at 9. Mere carelessness on the part of the attorney does not supply a cognizable justification for the delay.

---

[6] It is unclear whether the existence or degree of prejudice to the opposing party plays a role in a Rule 16(b) "good cause" calculus. The Ninth Circuit has held that it does not, although prejudice to the opposing party might "supply [an] additional reason to deny a motion [to amend]." Johnson, 975 F.2d at 609. The Sixth Circuit, on the other hand, has held that while the "good cause" analysis focuses primarily on whether the party was diligent in seeking the amendment, it also factors in whether the opposing party will suffer prejudice by virtue of the amendment. Leary, 349 F.3d at 906; see also S&W Enterprises, 315 F.3d at 536 (noting the Fifth Circuit's four-part test that includes the degree of prejudice to the opposing party). Here, Plaintiff's counsel conceded that to allow the amendment would not work any prejudice on the Plaintiff. 1/25/07 Trans. at 14. However, the Court concludes that examining the prejudice to the opposing party would shift the inquiry from the conduct of the moving party to the burden on the non-moving party, thus eviscerating the requirement that the moving party show "good cause."

The second reason asserted by Pottsgrove, somewhat contradictory to the first, is that it was not aware, when it filed it answer, of the facts that would lead it to conclude that the statute of limitations would be applicable.  Plaintiff disputes this assertion.  Three factors support Plaintiff's position opposing the amendment.  First, the complaint states that the sexual relationship took place during the 2003-04 school year and that it ended on approximately April 27, 2004, when Oakes was arrested.  Compl. ¶¶ 22, 25.  Second, Pottsgrove had at all times in its possession Plaintiff's school file, which lists her date of birth.[7]  See 1/25/07 Trans. at 5 (Pottsgrove's counsel: "[W]e have educations records which state her date of birth.").  Third, in its answer, Pottsgrove "denied that Plaintiff was a minor at all time relevant hereto."  Pottsgrove Ans. ¶ 4.  Under Rule 11(b)(4), Pottsgrove's counsel certified to the Court that, to the best of her "knowledge, information, and belief, <u>formed after an inquiry reasonable under the circumstances</u>," that the "denial[] of [this] factual contention[] [is] warranted on the evidence."  Fed. R. Civ. P. 11(b)(4) (emphasis added).  In other words, in its answer, Pottsgrove represented to the Court that it <u>knew</u> that Plaintiff was not a

---

[7] The Court provides no weight to Pottsgrove's dubious argument that while the <u>client</u> knew Plaintiff's date of birth, <u>counsel</u> did not.  Pottsgrove Reply at 3 n.2; 1/25/07 Trans. at 9-10.  Indeed, if the information was not provided to the attorney, then it was due to carelessness on the attorney's part.

minor at all relevant times.[8]

It is clear that Pottsgrove knew of the facts which would support the amendment--that the sexual relationship took place in 2003 and 2004, that Plaintiff turned eighteen on February 14, 2004, and that the complaint was filed on March 10, 2006--the date suit was filed.  In addition, in its answer, Pottsgrove "denied" that Plaintiff was a minor at all relevant times.  Thus, Pottsgrove did not "learn" Plaintiff's date of birth during her deposition, as it now claims.

Because Pottsgrove possessed the relevant knowledge on which to base a statute of limitations affirmative defense at the outset of the litigation and has not proposed a clear and cognizable justification for the five-month delay beyond the time set forth in the scheduling order, under Rule 16(b), it has failed to show "good cause" to allow the amendment.


B.  <u>Summary Judgment Standard</u>

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

---

[8] Admittedly, one factor does support Pottsgrove's position: the complaint states that Plaintiff "was a minor under eighteen years of age at all times relevant hereto."  Compl. ¶ 16.  This assertion is, of course, untrue.

13

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if its existence or non-existence would affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact. Id. at 248-49. "In considering the evidence, the court should draw all reasonable inferences against the moving party." El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007).

Although at the summary judgment stage the Court is to examine the entire record, Pottsgrove has objected on two grounds to the Court's consideration of Plaintiff's expert's report at this stage of the proceedings. The first purported ground for objection is that the expert examined Plaintiff before Plaintiff was deposed. This objection has no merit. Pottsgrove has identified no authority that Plaintiff's expert must take into account certain deposition testimony before delivering his report. This objection is apparently based on the fact that while Plaintiff's expert theorizes that Plaintiff did not have the capacity to consent to the sexual activity, Plaintiff testified in her deposition that the sex was consensual. Pottsgrove may attempt to impeach the expert at trial with this apparent contradiction; it may not, however, foreclose altogether

14

consideration of the expert's report by the Court on summary judgment.

Pottsgrove's second ground for objecting to the report is that the report was not verified under Federal Rule of Civil Procedure 56(e).  However, Plaintiff has remedied this deficiency by submitting the expert's sworn verification as an exhibit to its supplemental memorandum of law (doc. no. 42, ex. A).[9]  The Third Circuit has indicated that "evidence should not be excluded on summary judgment on hypertechnical grounds," Fowle v. C & C Cola, 868 F.2d 59, 67 (3d Cir. 1989), and there is no requirement in the Federal Rules that a verification be submitted contemporaneously with a report.  In fact, once Pottsgrove raised this issue, Plaintiff corrected the error.  Cf. id. (excluding the unsworn expert's report in part because, after "defendants raised this issue in the district court, [] plaintiff did nothing to correct the error before that court").  Therefore, the Court will consider Plaintiff's expert's report in deciding the motions for summary judgment.

C.  Application

1.  Pottsgrove's motion for summary judgment

Plaintiff has three claims still pending against the

---

[9] While the verification was attached to the brief filed with the Clerk, it was, for some reason, not submitted on the ECF system.

Pottsgrove defendants: Title IX against the school district; §
1983 (Fourteenth Amendment) against Wishart; and intentional
infliction of emotional distress against Wishart.

> a.   Title IX against Pottsgrove

Plaintiff alleges that Pottsgrove violated Title IX of the
Education Amendments of 1972.  Title IX provides that "[n]o
person . . . shall, on the basis of sex, be excluded from
participation in, be denied the benefits of, or be subjected to
discrimination under any education program or activity receiving
Federal financial assistance."  20 U.S.C. § 1681(a).

A private individual can both enforce Title IX, Cannon v.
Univ. of Chicago, 441 U.S. 677 (1979), and recover monetary
damages under it, Franklin v. Gwinnett County Pub. Sch., 503 U.S.
60 (1992).  See Warren ex rel. Good v. Reading Sch. Dist., 278
F.3d 163, 168 (3d Cir. 2002).  However, a plaintiff can recover
money damages under Title IX for a teacher's misconduct only upon
showing that an "appropriate person" had "actual notice of, and
[wa]s deliberately indifferent to, the teacher's misconduct."
Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 277, 290
(1998).

In other words, under the teachings of Gesber, a school
district may be liable for a teacher's sexual relationship with a
student if (1) the school district received federal financial

16

assistance, (2) the student was subjected to discrimination on the basis of sex, and (3) an "appropriate person" (4) had actual notice of, and was deliberately indifferent to, the discrimination.

Pottsgrove does not contest that Plaintiff succeeds on factors one and three.  There is no dispute here that Pottsgrove received federal financial assistance, bringing it within the ambit of Title IX.  And Pottsgrove does not dispute that Wishart is an "appropriate person," defined by the Supreme Court as an "official of the school district who at a minimum has authority to institute corrective measures on the district's behalf." Gesber, 524 U.S. at 277; cf. Warren, 278 F.3d at 170 ("[W]e think it is obvious from the [Supreme] Court's discussion [in Gesber] that knowledge of a principal can be sufficient in an appropriate case." (citing Gesber, 524 U.S. at 291-92)).

Instead, Pottsgrove focuses on factors two and four.  As to factor two, Plaintiff was indeed "subjected to discrimination on the basis of sex."  As to factor four, actual notice and deliberate indifference, there is a disputed issue of material fact.

(I) "Subjected to discrimination on the basis of sex"

Pottsgrove argues that Plaintiff was not "subjected to

17

discrimination on the basis of sex."  In <u>Gesber</u>, the Supreme
Court held that a teacher's "sexual[] harassment and abuse[] [of]
a student" constitutes "discriminat[ion] on the basis of sex."
524 U.S. at 281 (citing <u>Franklin</u>, 503 U.S. at 75).  The question
is thus whether Plaintiff was "sexually harassed" by Oakes such
that it constituted a violation of Title IX.

Pottsgrove argues that Plaintiff was not "harassed" because
she "consented" to sex with Oakes.  Indeed, in her deposition,
Plaintiff testified that the sexual relationship was
"consensual."  <u>See</u> Plaintiff Depo. at 133-34 ("Q: All the
intimate relations you had with [Oakes] were consensual; right?
A: Yes. . . .  Q: Did you choose to have sex with [Oakes]?  A.
Yes.").  Pottsgrove, however, conflates the question of whether
Plaintiff "consented" to Oakes's sexual advances with the
question of whether Plaintiff (a high school student in Oakes's
class) had the legal capacity to consent to the sex.  If
Plaintiff lacked the capacity to consent, of course, she did not
have the capacity to "welcome" Oakes's sexual advances.[10]

There are two helpful analogs in determining whether
Plaintiff had the capacity to consent to sex with Oakes.  The
first is the custodial situation, in which the aggressor, by

_____

[10] The proper inquiry for sexual harassment purposes is not
"consent" or "voluntariness," but rather "welcomeness."  <u>See</u>
<u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 68 (1986) ("The
gravamen of any sexual harassment claim is that the alleged
sexual advances were 'unwelcome.'").

virtue of his[11] position of custody or authority over the
aggrieved party, renders the aggrieved party incapable of
offering her effective consent.  For instance, a prisoner lacks
the capacity to consent to sex with her prison guard.  See
Deborah M. Golden, It's Not All In My Head: The Harm of Rape and
the Prison Litigation Reform Act, 11 Cardozo Women's L.J. 37, 39
(2004) ("[I]n a custodial context, consent is a legal
impossibility: the federal government, the District of Columbia,
and forty-seven states now criminalize sexual contact between
correctional staff and prisoners.").  Some states have taken this
principle to its next logical step, explicitly providing that a
student cannot consent to sex with her teacher.  See, e.g., Ga.
Code § 16-6-5.1 ("A . . . custodian or supervisor of another
person . . . commits sexual assault when he or she engages in
sexual contact with another person . . . who is enrolled in a
school . . . and such actor has supervisory or disciplinary
authority over such other person."); Randolph v. State, 496
S.E.2d 258 (Ga. 1998) (upholding conviction for principal's
sexual relationship with student); State v. Eastwood, 535 S.E.2d
246, 247 (Ga. Ct. App. 2000) (noting that it is the position of

---

[11] To mirror the factual scenario at issue here, a male
teacher having sex with a female student, when examining
hypothetical or universal scenarios in this Memorandum the Court
will employ the masculine form to refer to the teacher (or
analog) and the female for the student (or analog).  This
decision is meant simply for the ease of the reader.

the State of Georgia "that a student enrolled in a school cannot legally consent to acts of sexual intimacy with the student's school teacher").

The second helpful analog is the premise of statutory rape (or statutory sexual assault) and ages of consent.  A minor under a certain age is legally unable to offer her consent to have sex with an adult over a certain age, even if the sexual conduct was free of coercion or duress.  See, e.g., 18 Pa. Cons. Stat. § 3122.1 (defining "statutory sexual assault" as a "person engag[ing] in sexual intercourse with a complainant under the age of 16 years [if] that person is four or more years older than the complainant and the complainant and the person are not married to each other").  Relatedly, many states have "corruption of minors" laws, which are routinely used to hold adults criminally liable for engaging in sexual conduct with sixteen- and seventeen-year-olds--minors who are above the age of consent for statutory rape purposes.  See 18 Pa. Cons. Stat. § 6301(a)(1) (outlawing the "corruption of minors"); Commonwealth v. Tharp, 575 A.2d 557 (Pa. 1990) (upholding conviction for sex with sixteen-year-old).  Moreover, the alleged consent of the minor is not a defense to a corruption of minors charge.  See Commonwealth v. Decker, 698 A.2d 99, 100 (Pa. Super. Ct. 1997).  In other words, at least in the corruption of minors context, a minor lacks the capacity to consent to sex with an adult.

Thus, one line of precedent deals with positions of authority and custody.  The other line deals with age.  The teacher-student relationship encapsulates both of these lines, with teachers exercising custodial control over high school students in their classrooms, see 24 Pa. Cons. Stat. § 13-1317 (providing that teachers exercise in loco parentis authority over students while the students are in attendance at the school).  Under these circumstances, the Court concludes that Plaintiff did not have the legal capacity to welcome Oakes's sexual advances.

This is the result obtained by many courts, which have implicitly presumed, without much discussion, that a high school student's having sexual contact with her teacher constitutes sexual harassment or abuse.[12]  See, e.g., Gesber, 524 U.S. at 277-78, 281 (presuming that a high school student's sexual relationship with her teacher, while the student was a freshman and sophomore, was "sexual harassment"); P.H. v. Sch. Dist. of Kansas City, 265 F.3d 653, 659 (8th Cir. 2001) (finding that the two-year sexual relationship between high school student and his teacher (court was silent on student's age or year in school) was "sexual abuse"); King v. Conroe Ind. Sch. Dist., 2005 WL 1667803, at *1, 4 (S.D. Tex. July 15, 2005) (assuming that three-year

---

[12] Neither the parties nor this Court, in its own research, has identified a case holding otherwise.

sexual relationship between student and teacher, beginning when plaintiff was fourteen years old, constituted "sexual harassment"); <u>Doe v. Sch. Admin. Dist. No. 19</u>, 66 F. Supp. 2d 57, 62 (D. Me. 1999) ("Sexual relations between a minor student and teacher is considered sexual harassment even if the teacher does not expressly threaten to inflict a penalty . . . ."); <u>see also</u> <u>Davis v. Monroe County Bd. of Educ.</u>, 526 U.S. 629, 675 (1999) (Kennedy, J., joined by Rehnquist, C.J., and Scalia and Thomas, JJ., dissenting) ("A teacher's sexual overtures toward a student are always inappropriate . . . ."). And one appellate court, relying on a jury's adverse verdict, rejected the teacher's argument that he could not have deprived the high school student of her constitutional rights because she had consented to the sexual relationship. <u>Wilson v. Webb</u>, 2000 WL 1359624, at *9 (6th Cir. Sept. 13, 2000) (unpublished).

Somewhat to the contrary is the individualized circumstances approach endorsed by the Federal Department of Education (DOE), which has issued a formal "Guidance" on the subject of sexual harassment under Title IX. <u>See</u> Office of Civil Rights, Dep't of Educ., <u>Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties</u> (Jan. 2001), <u>available at</u> http://www.ed.gov/about/offices/list/ocr/docs/shguide.pdf

[hereinafter DOE Sexual Harassment Guidance].[13]  The DOE
recognizes that there are "particular issues of welcomeness if
the alleged harassment relates to alleged 'consensual' sexual
relationships between a school's adult employees and its
students."  Id. at 8.  The DOE divides students into three
groups: elementary, secondary, and post-secondary.  With regard
to elementary and post-secondary students, the answers are clear-
cut: elementary school students lack, and post-secondary school
students possess, the capacity to welcome sexual conduct from a
teacher.

For high school students, and especially relevant to this
case, the line drawn by the DOE is more nice than bright.  The
DOE lists a number of factors to be considered in determining
whether the conduct could be considered "welcome."[14]  Age,

_____

[13] The DOE's Sexual Harassment Guidance provides just that:
guidance.  It is not binding on this Court, but rather a resource
on the DOE's position.  It sets out the "compliance standards
that [the DOE] applies in investigations and administrative
enforcement of Title IX," as "distinguish[ed] from the standards
applicable to private litigation for money damages."  DOE Sexual
Harassment Guidance at I.  As the DOE explained in its request
for comments, the Sexual Harassment Guidance is designed to
"provide educational institutions with guidance about the
standards under Title IX . . . that [the DOE] use[s], and that
institutions should use, to investigate and resolve allegations
of sexual harassment of students."  Office of Civil Rights, Dep't
of Educ., Notice, Revised Sexual Harassment Guidance: Harassment
of Students by School Employees, Other Students, or Third
Parties, 65 Fed. Reg. 66092, 66092 (2000).

[14] The DOE provides:

In cases involving secondary students, there will be a

relationship of the student and teacher, and disability, according to the DOE, should be considered in the totality-of-the-circumstances test.

The DOE Sexual Harassment Guidance with respect to sexual conduct between a teacher and high school students assigned to his class is flawed for three reasons.  One, the DOE conflates consent with capacity to consent.  (As discussed above, Pottsgrove commits the same error.)  Again, while a student may have seemingly willingly engaged in the sexual conduct, the student might nevertheless have lacked the legal capacity to do so.  Two, the totality-of-the-circumstances test, imported from the Title VII jurisprudence, is inapposite because under Title VII, the question is not whether the subordinate employee had the capacity to welcome the superior's sexual advances, but rather whether the subordinate in fact did so.  Three, as a matter of policy, the totality-of-the-circumstances test is unworkable.  Under the DOE Sexual Harassment Guidance's factors for "welcomeness," a high school teacher's having sex with some students might violate Title IX, while the same teacher's having

---

strong presumption that sexual conduct between an adult school employee and a student is not consensual.  In cases involving older secondary students, subject to the presumption, [the DOE] will consider a number of factors in determining whether a school employee's sexual advances or other sexual conduct could be considered welcome.

DOE Sexual Harassment Guidance at 8 (footnote omitted).

sex with other students in the same class, because they are of a different age or mental capacity or the sex occurs under slightly different circumstances, would not.  In this situation, a murky line is worse than a bright one.

The Court therefore holds that a high school student who is assigned to a teacher's class does not have the capacity to welcome that teacher's physical sexual conduct.[15]  Under these circumstances, the teacher's conduct is deemed unwelcomed.  Unwelcome sexual conduct constitutes a sexually hostile educational environment, a form of sexual harassment.  And sexual harassment constitutes discrimination on the basis of sex.  Thus, a teacher who has sex with a high school student who is assigned to his class discriminates against the student on the basis of sex in violation of Title IX.

(ii) <u>Actual notice and deliberate indifference</u>

Whether Wishart had actual notice of, and was deliberately indifferent to, Oakes's sexual relationship with Plaintiff is a disputed factual issue, and therefore inappropriate for disposition on summary judgment.

"An educational institution has 'actual knowledge' [or

---

[15] Indeed, here, the school superintendent, Dr. Richardson, testified in her deposition that, under the district's sexual harassment policy, "[b]y definition, [a teacher's sexual conduct is] unwelcomed if it's with a student."  Richardson Depo. at 105.

'actual notice'] if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." Bostic v. Smyrna Sch. Dist., 418 F.3d 355, 361 (3d Cir. 2005) (quoting 3C Fed. Jury. Prac. & Instr. § 177.36 (5th ed. 2001)).  Here, to meet the standard for "actual notice," Plaintiff must show that Wishart "ha[d] knowledge of facts sufficiently indicating substantial danger to a student so that [Pottsgrove] can reasonably be said to be aware of the danger." Id. at 360 (affirming district court's use of this language in Title IX jury instruction).  "Actual notice" cannot be based on a mere "possibility." Id. at 361.

Moreover, to succeed on her claim, Plaintiff must show that, after obtaining "actual notice" of the underlying facts, Wishart exercised "deliberate indifference" to those facts by engaging in a "clearly unreasonable" response. Vaird v. Sch. Dist. of Phila., 2000 WL 576441, at *3 (E.D. Pa. May 12, 2000).  In other words, if Wishart took "timely and reasonable measures" to end the harassment, id., even if she were unsuccessful, then she did not display deliberate indifference to it.  In short, Wishart must have been aware of the sexual relationship and failed to take reasonable action to respond to this knowledge.

Judge Posner has noted that, "[o]rdinarily, actual notice and deliberate indifference are alternative paths to proving knowledge. . . . But under the Supreme Court's formula, the

plaintiff in a Title IX damages suit based on a teacher's behavior must prove actual knowledge of misconduct, not just actual knowledge of the risk of misconduct, and must also prove that the officials having that knowledge decided not to act on it."  Delgado v. Stegall, 367 F.3d 668, 671-72 (7th Cir. 2004).

Here, the evidence, as viewed in the light most favorable to Plaintiff, demonstrates that Wishart might have had actual notice of Oakes's sexual relationship with Plaintiff.  In summer 2003, Wishart was notified by Dr. Richardson, the superintendent, that Oakes was seen leaving a restaurant with a female student.  Shortly thereafter, in August 2003, Oakes informed Wishart that Plaintiff had told A.P. that Oakes and Plaintiff were engaged in a sexual relationship.  A reasonable person might conclude that Wishart was provided actual notice by these incidents.

Moreover, the evidence also demonstrates that Wishart might have displayed deliberate indifference to the relationship, allowing it continue for another seven months.  Construing the evidence in the light most favorable to Plaintiff, Wishart did not speak with Plaintiff or Plaintiff's parents about the allegation; did not report the allegation to Dr. Richardson, the superintendent; and, in possible contravention of the school district's sexual harassment policy--"A principal receiving a report of sexual harassment will immediately refer the report to the Assistant Superintendent for determination of appropriate

investigation"--did not report the allegation to the assistant superintendent.  Indeed, according to Plaintiff, Wishart took no action at all to investigate the relationship.

Therefore, the Court will deny summary judgment on the Title IX claim against the school district.  Oakes <u>did</u> sexually harass Plaintiff, in violation of Title IX.  And there is a disputed issue of material fact as to whether Wishart had actual notice of, and was deliberately indifferent to, the sexual harassment.

### b.  <u>§ 1983 (Fourteenth Amendment) against Wishart</u>

Plaintiff alleges that Wishart is personally subject to liability under § 1983.  To establish a § 1983 claim, Plaintiff must "demonstrate a violation of a right protected by the Constitution or laws of the United States that was committed by a person acting under the color of state law."  <u>Nicini v. Morra</u>, 212 F.3d 798, 806 (3d Cir. 2000) (en banc).  Wishart concedes that she acted under color of state law.  Plaintiff asserts that she was deprived of her constitutional right to be free from sexual abuse, <u>Stoneking v. Bradford Area Sch. Dist.</u> (<u>Stoneking II</u>), 882 F.2d 720, 727 (3d Cir. 1989), and violations of bodily integrity, <u>Black by Black v. Indiana Area Sch. Dist.</u>, 985 F.2d 707, 709 n.1 (3d Cir. 1993).

However, Wishart cannot be liable under § 1983 simply by virtue of her position as Oakes's supervisor; she must have in

28

some way caused the deprivation of Plaintiff's constitutional
rights.  Here, Plaintiff alleges that Wishart caused Plaintiff's
injuries by (1) failing to supervise Oakes and (2) failing to
investigate Oakes's conduct.

The Fifth Circuit, confronted with the similar situation of
a high school teacher having a sexual relationship with a
student, adopted the following test to determine whether the
teacher's supervisor could be liable under § 1983:

> A supervisory school official can be held personally
> liable for a subordinate's violation of an elementary
> or secondary school students constitutional right to
> bodily integrity in physical sexual abuse cases if the
> plaintiff establishes that:
> (1) the defendant learned of facts or a pattern of
> inappropriate sexual behavior by a subordinate pointing
> plainly toward the conclusion that the subordinate was
> sexually abusing the student; and
> (2) the defendant demonstrated deliberate indifference
> toward the constitutional rights of the student by
> failing to take action that was obviously necessary to
> prevent or stop the abuse; and
> (3) such failure caused a constitutional injury to the
> student.

Doe v. Taylor Ind. Sch. Dist., 15 F.3d 443, 454 (5th Cir. 1994)

(en banc); see also Baynard v. Malone, 268 F.3d 228, 236 (4th

Cir. 2001)(adopting similar test); Gates v. Unified Sch. Dist.

No. 449 of Leavenworth County, 996 F.2d 1035, 1041 (10th Cir.

1993) (same).  This test is consistent with the Third Circuit's

teachings--that a plaintiff can establish supervisory liability

under § 1983 by showing that the supervisor "had knowledge of and

acquiesced in [her] subordinate['s] violations," A.M. ex rel.

<u>J.M.K. v. Luzerne County Juvenile Detention Ctr.</u>, 372 F.3d 572, 586 (3d Cir. 2004)--and the Court concludes that it encapsulates the potential liability in this situation.

The first two prongs mirror the discussion above as to Title IX liability for the school district: whether Wishart was aware of the sexual relationship and whether she was deliberately indifferent to it.  As discussed above, these are questions that are in dispute and are left to the jury to decide.

The third prong is whether Wishart's alleged failure caused a constitutional injury to Plaintiff.  Students have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, to be free from sexual assault by their teachers.  <u>Stoneking II</u>, 882 F.2d at 727.  Oakes's sexual relationship with Plaintiff constituted sexual harassment, <u>see supra</u> Section II.C.1.a.i., and assuming that Wishart knew about the relationship (which is in dispute), her failure to investigate it further and/or prevent Oakes from continuing it allowed it to progress for an additional seven months.  Under this scenario, Wishart's actions could have "caused" Plaintiff's injury.

Therefore, Pottgrove's motion for summary judgment as to Plaintiff's § 1983 claim against Wishart will be denied.[16]

---

[16] Wishart argues that she is entitled to qualified immunity.  However, because of the outstanding factual dispute, the Court is not currently in a position to make this

c. Intentional infliction of emotional distress
against Wishart

A claim for intentional infliction of emotional distress requires three showings: (1) that the defendant's conduct was extreme and outrageous, (2) that the defendant's conduct caused the plaintiff severe emotional distress, and (3) that the defendant acted intending to cause the plaintiff such distress or with knowledge that such distress was substantially certain to occur.  Brown v. Muhlenberg Twp., 269 F.3d 205, 218 (3d Cir. 2001).  The Third Circuit has held that Pennsylvania, which has

---

determination.  See Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002) ("[A] decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis.").

For § 1983 actions, public officials generally enjoy qualified immunity for their actions unless those actions violate clearly established constitutional rights of which a reasonable person should know.  Harlow v. Fitzgerald, 457 U.S. 800, 817–18 (1982).  Here, both the underlying constitutional right (to be free of sexual abuse) and Wishart's duty under § 1983 (not to be deliberately indifferent to a subordinate's violation of that right) have been "clearly established" in this Circuit for quite some time.  See Stoneking II, 882 F.2d at 727.

The Court must determine if, in light of this clearly established law, Wishart's actions were "objective[ly] legal[ly] reasonable[]."  Anderson v. Creighton, 483 U.S. 635, 639 (1987). The wrinkle is that, at this stage of the litigation, Wishart's actions (or inactions) are in dispute.  Indeed, the Court cannot determine if Wishart's actions were objectively legally reasonable if the parties dispute what those actions were. Therefore, the Court will revisit the issue of qualified immunity at the conclusion of trial.

yet to explicitly recognize the tort of intentional infliction of emotional distress, would apply the formulation of intentional infliction of emotional distress as expressed in the <u>Restatement (Second) of Torts</u> § 46.  <u>See</u> <u>Williams v. Guzzardi</u>, 875 F.2d 46, 50 (3d Cir. 1989).  The Restatement provides:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

<u>Restatement (Second) of Torts</u> § 46.

Although the question of a defendant's liability for intentional infliction of emotional distress is typically entrusted to the jury, under Pennsylvania law, it is for the Court to determine, at the outset, whether the defendant's conduct, as alleged by the plaintiff, is so extreme that it can be labeled "outrageous."  <u>Cox v. Keystone Carbon Co.</u>, 861 F.2d 390, 395 (3d Cir. 1988).

Here, construing the evidence in the light most favorable to Plaintiff, Wishart was provided notice that Oakes and Plaintiff were engaged in an inappropriate sexual relationship and decided not to undertake an investigation, thereby allowing the relationship to continue for another seven months.  A reasonable observer, upon hearing the fact that a principal was deliberately indifferent to a teacher's ongoing sexual relationship with his student, might be prone to exclaim, "outrageous!"  <u>Kazatsky v.</u>

<u>King David Mem. Park, Inc.</u>, 527 A.2d 988, 991 (Pa. 1987) (quoting <u>Restatement (Second) of Torts</u> § 46 cmt. d).

Therefore, Wishart's motion for summary judgment on the intentional infliction of emotional distress claim will be denied.


2.  <u>Oakes's motion for summary judgment</u>

Plaintiff has two counts still pending against Oakes: a § 1983 claim (based on the Fourth and Fourteenth Amendments) and a state-law claim for intentional infliction of emotional distress. In addition to arguing that he is entitled to summary judgment on the merits of both claims, Oakes asserts that the statute of limitations bars all claims against him.


a.  <u>Statute of limitations</u>[17]

The statute of limitations for both of Plaintiff's claims against Oakes would normally be two years.  The claim for intentional infliction of emotional distress is a state-law claim for which the statute of limitations is two years.  42 Pa. Cons. Stat. § 5524(2).  For the § 1983 claim, this federal court is to "borrow" the state-law personal injury statute of limitation. See <u>Wilson v. Garcia</u>, 471 U.S. 261, 266-67 (1985).  Again, that

_____

[17] Oakes was permitted to amend his answer to add the statute of limitations as an affirmative defense, based on Plaintiff's lack of objection to Oakes's motion to amend.

limit is two years.  42 Pa. Cons. Stat. § 5524(2).

However, for the § 1983 claim, the Court not only "borrows" the state's statute of limitations, the Court also "borrows" the state's tolling rules.  See Lake v. Arnold, 232 F.3d 360, 368 (3d Cir. 2000) (citing Wilson v. Garcia, 471 U.S. 261, 276-80 (1985), and Hardin v. Straub, 490 U.S. 536, 543-44 (1989)).  (Obviously, these same tolling rules apply to the state-law claim for intentional infliction of emotional distress.)  There are two tolling rules at issue here.  The first applies to all minors, providing that the statute of limitations for a tort against a minor begins to run when the minor turns eighteen years old.  42 Pa. Cons. Stat. § 5533(b)(1).  Here, Plaintiff turned eighteen on February 14, 2004.  Therefore, the statute of limitations for acts committed when Plaintiff was a minor expired on February 14, 2006.  Plaintiff did not file the present suit until March 10, 2006, almost a month later.  Under the tolling rule for torts against minors, then, Plaintiff is time-barred from pursuing claims against Oakes for actions while Plaintiff was a minor.

The second tolling rule is more specific: it provides that an individual has twelve years from her eighteenth birthday (i.e., until she turns thirty) to bring suit for "childhood sexual abuse."  42 Pa. Cons. Stat. § 5533(b)(2)(I).  If this tolling rule applies here, then Plaintiff's claims against Oakes are not time-barred.

The question before the Court is thus whether Plaintiff's claims against Oakes under § 1983 and for intentional infliction of emotional distress are based on "childhood sexual abuse."  The statute defines "childhood sexual abuse" in part as "sexual activities between a minor and an adult."  The definition of "sexual activities" encompasses the types of sexual acts at issue here (vaginal and oral intercourse), and Oakes was a minor (she was seventeen years old) and Plaintiff was an adult (he was twenty-nine).  Id. § 5533(b)(2)(ii)(A), (B).  However, the statute provides an important limitation on the definition of "childhood sexual abuse": "the individual bringing the civil action [must have] engaged in such activities as a result of forcible compulsion or by threat of forcible compulsion which would prevent resistance by a person of reasonable resolution."  Id. § 5533(b)(2)(ii).  The definition of "forcible compulsion" in the tolling statute is taken from the criminal code, id. § 5533(b)(2)(iii): "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied."  18 Pa. Cons. Stat. § 3101.

Plaintiff argues that Oakes compelled her to engage in the sexual relationship, by virtue of intellectual, moral, emotional, or psychological force.[18]  Oakes, on the other hand, argues that

---

[18] The report of Plaintiff's expert, Dr. Elliot L. Atkins, supports this position.  See Atkins Report at 8 ("[I]t was not only because of her age, but also because of her emotional

35

the sexual relationship was consensual and that Plaintiff was a willing--and, at times, instigating--participant.

The Pennsylvania Supreme Court has addressed the definition of "forcible compulsion" as it relates to sex acts between an adult and a minor:

> There is an element of forcible compulsion, or the threat of forcible compulsion that would prevent resistance by a person of reasonable resolution, inherent in the situation in which an adult who is with a child who is younger, smaller, less psychologically and emotionally mature, and less sophisticated than the adult, instructs the child to submit to the performance of sexual acts.  This is especially so where the child knows and trusts the adult.  In such cases, forcible compulsion or the threat of forcible compulsion derives from the respective capacities of the child and the adult sufficient to induce the child to submit to the wishes of the adult ("prevent resistance"), without the use of physical force or violence or the explicit threat of physical force or violence.

Commonwealth v. Rhodes, 510 A.2d 1217, 1227 (Pa. 1986).  The Rhodes court also provided a non-exhaustive list of factors that might determine whether sex acts between an adult and a minor were the result of "forcible compulsion":

> the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress.

---

vulnerability that Jeanette Chancellor was not in the position to truly consent to the sexual overtures of her teacher.  Christian Oakes was in a position of power and authority of Jeanette Chancellor.").

Id. at 1226.

Here, Plaintiff was seventeen years old; Plaintiff was twenty-nine.  Plaintiff suffered from depression.  The sex acts often took place at the school, a physical setting in which Oakes, as Plaintiff's teacher and band instructor, held a position of authority over her.  Oakes also exerted custodial control over Plaintiff, as many of the sex acts took place during band camp, band practices, and on the band trip to Virginia Beach, when Oakes was ostensibly in charge of Plaintiff.  See 24 Pa. Cons. Stat. § 13-1317 (providing that teachers exercise in loco parentis authority over students while the students are in attendance at the school); DOE Sexual Harassment Guidance at 10 ("Elementary and secondary schools . . . are typically run in a way that gives teachers . . . a substantial degree of supervision, control, and disciplinary authority over the conduct of students.").

Drawing all reasonable inferences in favor of Plaintiff, as the Court must do at this stage of the litigation, there is a reasonable issue of material fact as to whether Plaintiff was "compelled," by virtue of intellectual, moral, emotional, or psychological force, to submit to the sexual relationship.  This is thus a question for the factfinder.

Therefore, at this stage of the litigation, judgment in favor of Oakes based on the statute of limitations is

inappropriate.

          b. <u>§ 1983 (Fourth and Fourteenth Amendments)</u>

          <u>against Oakes</u>

Section 1983 is a vehicle by which a plaintiff can assert a claim against a person who, acting under color of state law, deprives the plaintiff of a constitutional right.  42 U.S.C. § 1983.  Here, Plaintiff alleges that Oakes violated her Fourth Amendment right to be free from unreasonable seizures and her Fourteenth Amendment due process right to bodily integrity.  <u>See</u> U.S. Const. Amd. IV (providing protection from "unreasonable searches and seizures"); <u>Stoneking II</u>, 882 F.2d at 726-27 (holding that a student has a Fourteenth Amendment due process right to be free from intrusions of his bodily integrity, including "a right to be free from sexual assaults by his or her teachers").  Oakes does not contest the assertion that he was acting under color of state law.

Oakes's defense is that, in having sex with Plaintiff, he did not "seize" her or violate her right to bodily integrity because she consented to the sex.  However, Plaintiff, as a student in Oakes's class, lacked the capacity to consent to engage in sexual conduct with him.  Therefore, Plaintiff's § 1983 claims against Oakes will survive summary judgment.

38

c. <u>Intentional infliction of emotional distress</u>
<u>against Oakes</u>

As with the claim against Wishart for intentional infliction of emotional distress, to succeed here Plaintiff must show (1) that Oakes's conduct was extreme and outrageous, (2) that Oakes's conduct caused Plaintiff severe emotional distress, and (3) that Oakes acted intending to cause Plaintiff such distress or with knowledge that such distress was substantially certain to occur. <u>Brown v. Muhlenberg Twp.</u>, 269 F.3d 205, 218 (3d Cir. 2001).

Oakes has two arguments here, neither of which are availing. The first is that he cannot be liable for intentional infliction of emotional distress because Plaintiff consented to the sexual relationship.  Again, Plaintiff lacked the capacity to consent to the sex.

Oakes's second argument is that he cannot be liable for intentional infliction of emotional distress because his having sex with Plaintiff was not criminal.  Oakes's argument fails for two reasons.  One, there is no requirement that a claim for intentional infliction of emotional distress be based on criminal activity.  Two, Oakes's having sex with Plaintiff <u>was</u> criminal: while he was not convicted of statutory sexual assault (because Plaintiff was over sixteen years old, the age of consent for

statutory rape), Oakes was convicted[19] of corrupting the morals of a minor, in violation of 18 Pa. Cons. Stat. § 6301(a)(1), based on his sexual relationship with Plaintiff.

Therefore, Plaintiff's claim for intentional infliction of emotional distress will survive summary judgment. Cf. DiSalvio v. Lower Merion High Sch. Dist., 158 F. Supp. 2d 553, 557 (E.D. Pa. 2001) (holding that a high school coach's sexual harassment of a student could support a claim for intentional infliction of emotional distress against the coach).

III.  CONCLUSION

Pottsgrove's motion to amend its answer to add the statute of limitations as an affirmative defense will be denied. Pottsgrove's motion for summary judgment will be denied.  Oakes's motion for summary judgment will be denied.

An appropriate Order follows.

---

[19] At oral argument, Oakes's counsel posited that because Oakes pled guilty to the offense, as opposed to having been convicted at trial, his plea should not be held against him here. Oakes has presented no authority for the proposition that a guilty plea should be treated any differently in a subsequent civil action than a conviction at trial.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEANETTE CHANCELLOR, | : | CIVIL ACTION |
| | : | NO. 06-1067 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LOWER POTTSGROVE SCHOOL | : | |
| DISTRICT, et al., | : | |
| | : | |
| Defendants. | : | |

ORDER

**AND NOW**, this **8th** day of **August 2007,** for the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that Defendants Pottsgrove School District and Joyce Wishart's motion to amend their answer (doc. no. 25) is **DENIED.**

It is further **ORDERED** that Defendants Pottsgrove School District and Joyce Wishart's motion for summary judgment (doc. no. 30) is **DENIED.**

It is further **ORDERED** that Defendant Christian Oakes's motion for summary judgment (doc. no. 31) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants Pottsgrove School District and Joyce Wishart's motion for leave to file reply memorandum of law (doc. no. 34) is **GRANTED.**

**AND IT IS SO ORDERED.**

 S/Eduardo C. Robreno
**EDUARDO C. ROBRENO, J.**